IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KENNETH D. DILLEY, | ) | CASE NO. 4:08CV3005 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the Motion for Partial Summary Judgment, filed by the plaintiff, Kenneth D. Dilley (Dilley) *(Filing No. 51)*. For the reasons stated below, the motion is granted in part and denied in part.

**I.   BACKGROUND**

  **A.   Dilley's Medical History**

Dilley is a veteran of the United States Air Force. Dilley has a long and complex medical history, but at issue here is the medical attention Dilley received from the Omaha Veterans' Affairs Medical Center (VAMC) from June 2004 through January 2005. On June 1, 2004, Dilley sought treatment at the VAMC, which is owned and operated by the defendant, the United States of America (United States). On that date, Dilley met with Dr. Viseslav Drincic (Dr. Drincic), a physician at the VAMC. Dilley told Dr. Drincic that he was experiencing chest pain and rectal bleeding. Dr. Drincic examined Dilley's abdomen and ordered a complete blood count (CBC). The CBC was normal, and no further testing was ordered.

Dilley returned to the VAMC for treatment on June 15, 2004, and was seen by a physician's assistant. Dilley complained of abdominal tenderness and stated he had not been feeling well for the past five or six days. Dilley reported episodic abdominal pain localized to his right side, difficulty passing stool, and bright red blood coming from his

rectum. A second CBC was ordered and found to be normal. Dilley was instructed to seek immediate medical attention if the abdominal pain became more severe, but no more treatment was provided at that time. The following day, Dilley sought treatment from the VAMC Emergency Room for constant chest pain.

On July 15, 2004, Dilley was seen by another VAMC physician's assistant. Dilley complained of constipation, occasional blood from his rectum, and abdominal pain in the upper right quadrant of his abdomen, along with an associated pain in the right side of his chest wall. Dilley was given a chest x-ray, which was normal, and an ultrasound of the upper abdomen, which revealed only a fatty liver.

On September 1, 2004, Dilley met with Dr. Drincic and again reported abdominal pain. Dr. Drincic entered an order for Dilley to receive a barium enema, but the VAMC never contacted Dilley about the procedure and failed to perform the barium enema for unknown reasons. Dr. Drincic also referred Dilley to the Gastroenterology Clinic for an evaluation of the fatty liver changes which were discovered on the July 15, 2004, ultrasound. That appointment did not occur until November 15, 2004. On September 25, 2004, Dilley was seen at the Omaha VA Hospital for an evaluation of reported lower back pain.

Dilley called the VAMC on either October 14 or October 15, 2004, and left a message stating that he had "black chunks" in his stool. The VAMC returned Dilley's telephone call, but informed him there were no appointments available for that afternoon or the following day. Dilley was instructed to call the Nursing Triage line, which he did, and an appointment was scheduled for October 29, 2004.

Dilley attended his scheduled appointment on October 29, 2004, and was seen by a physician's assistant. Dilley complained of continuous abdominal pain, bloating, black stools, and other stools that looked like "dark red jelly." Dilley stated eating made his abdominal pain worse. The physician's assistant examined Dilley's abdomen and

observed the abdomen appeared to be distended and noted tenderness upon palpation. Dilley was scheduled for an upper gastrointestinal series (UGI) to be performed on November 15, 2004.  Dr. Drincic also ordered a flexible sigmoidoscopy, which was not scheduled to be performed until January 12, 2005.

On November 15, 2004, the UGI was performed and was determined to be "unremarkable."  That afternoon, Dilley attended his first appointment in the Gastroenterology Clinic with Dr. Sue Harmon (Dr. Harmon). The purpose of Dilley's gastroenterology appointment was to evaluate Dilley's fatty liver changes which were discovered on July 15, 2004.  Dilley again reported abdominal pain and described a "change in bowel habits consisting of dark red stools and mucus."  Dr. Harmon conducted an examination of Dilley's abdomen, which was "unremarkable."  The sigmoidoscopy which had previously been scheduled was canceled, and a colonoscopy was ordered in its place. Dr. Harmon also recommended an esophagogastroduodenoscopy (EGD) to evaluate Dilley's stomach and esophagus concurrently with the colonoscopy, which was scheduled for January 12, 2005.  Because Dilley had a history of chest pain, Dilley needed to be evaluated by the Cardiology Clinic before either of the scheduled procedures could take place.

On December 8, 2004, Dilley returned to the VAMC complaining of chest pain and abdominal pain.  Dilley also reported blood in his stools, which was jelly-like and occasionally black, and abdominal pain.  Dr. Drincic examined Dilley's abdomen, but did not identify any tenderness.

Dilley went to the Cardiology Clinic on December 20, 2004, for cardiac evaluation and testing.  Three days later, Dilley had a left heart catheterization performed to evaluate his chest pains.  This test "revealed severe native vessel disease."  The Cardiology Clinic recommended continued aggressive risk factor modifications and medical management.

On December 30, 2004, a VAMC health technician contacted Dilley to discuss the colonoscopy which had been scheduled for January 12, 2004.  The following day, on December 31, 2004, Dilley reported to the VAMC Emergency Room with severe and constant abdominal pain in his lower left quadrant.  A computerized tomography (CT) scan was performed, which revealed an abnormal mass in Dilley's sigmoid colon.  Dilley was taken to the operating room and immediately underwent emergency surgery to remove the mass.  Dilley alleges, "Pathology examined the sigmoid colon resection and found diverticulosis with diverticulitis and transmural inflammation with serositis (rupture)."  Dilley was continuously hospitalized until January 10, 2005, when he was discharged and returned home.

Dilley asserts he has since "experience[d] numerous complications pertaining to his emergency colon surgery and perforated diverticula."  Dilley specifically claims "[h]e has required re-admission to the Omaha VAMC on multiple occasions and underwent various additional surgical procedures for problems which included obstruction, strictures, and a fistula which resulted in the drainage of fecal material through Mr. Dilley's abdominal wall."  Dilley reports he was hospitalized twice in April 2007 "for repair of an incisional hernia and a post-operative wound infection."

Dilley was also required to get a colostomy.  While Dilley was able to get his colostomy removed in March 2005, he was required to have another colostomy placed in late June 2005.  Dilley states he still has a colostomy and "has been told that it is very unlikely that he will ever see a return of normal bowel function," and "[h]e has also been told to expect to continue to suffer from periodic problems with obstruction."  Dilley alleges, "In addition to having to wear a colostomy bag, [Dilley] also suffers from severe and chronic abdominal pain, believed to be related to the adhesions he developed as a result of multiple surgeries."  Dilley also maintains "[h]is abdomen is visibly distended at all times; his waist size has increased from a 34 to a 40, although he has lost weight overall."

### B. Procedural History and Pending Litigation

On December 19, 2006, Dilley filed an administrative tort claim with the Department of Veteran Affairs, which was later denied. On January 9, 2008, Dilley filed a complaint with this court, alleging:

> [A]gents or employees of the United States of America at the VA Nebraska Western Iowa Health Care System—Omaha Division deviated from appropriate standards of medical care in providing medical care and treatment to [Dilley] in the following respects:
>
> (a) Negligent failure to arrange for appropriate diagnostic tests and studies including, but not limited to, colonoscopy at any time prior to December 31, 2004;
>
> (b) Negligent delay in diagnosing and providing appropriate medical treatment for diverticulosis, leading to a rupture and subsequent permanent colon damage;
>
> (c) Negligent performance of surgical procedures on December 31, 2004;
>
> (d) Negligent medical care in the months following the [December 31, 2004] surgery, leading to additional complications and surgical procedures, with resulting damage to [Dilley]; and
>
> (e) Committing other negligent acts or omissions in violation of the applicable standards of medical care.

The United States answered Dilley's complaint asserting eight defenses and denying Dilley's allegations of negligence.

On May 22, 2009, Dilley filed a motion for partial summary judgment as to the liability of the United States, stating, "[t]here is no genuine issue of material fact regarding the negligence of the [United States'] agents," and "[n]o rational finder of fact could find in favor of the [United States] on the issue of liability." In Dilley's memorandum in support of his motion, Dilley asserts the United States deviated from the standard of care when employees of the VAMC "failed to perform an adequate colon evaluation for [Dilley] in the three-month time period that constitutes the standard of care," and "downplayed or outright ignored [Dilley's] complaints" resulting in Dilley seeking emergency treatment at the VAMC

Emergency Room on December 31, 2004. Dilley argues "compliance with the standard of care would have resulted in a diagnosis of [Dilley's] diverticular disease (including diverticulosis) long before his acute, emergent presentation at the end of December." Dilley claims, based on this diagnosis, the United States' agents should have educated Dilley "that his diverticulosis could develop into diverticulitis, a serious condition involving inflammation of the colon," and "[h]e should have been warned that diverticulitis needs prompt treatment in order to avoid catastrophic consequences, such as hospitalization, intravenous antibiotics, and the need to wear a colostomy bag." Dilley concludes, with this education, he would have known he should seek immediate medical care if he experienced increased pain. Instead, "when [Dilley] experienced increased pain on or about December 28, 2004, he had no reason to believe that this new pain was a reason to seek medical care," because "[a]fter months of seeking treatment for his abdominal pain and other symptoms, his health care providers had led him to believe that his presentation was not serious and could wait until his colonoscopy scheduled for January 12, 2005."

On June 15, 2009, the United States submitted a brief responding to Dilley's motion for partial summary judgment. In its brief, the United States conceded several of the undisputed facts set out by Dilley in his memorandum in support of his motion, including:

(1) "On June 1, 2004, [Dilley] reported rectal bleeding to [Dr. Drincic], a physician at the VAMC";

(2) "This bleeding should have caused [Dilley's] health care providers to be concerned that its cause was a life-threatening illness, but such concern was absent from this June visit";

(3) "The applicable standard of care required a reasonable physician to investigate [Dilley's] rectal bleeding through a colon examination";

(4) "Had the VAMC provided [Dilley] with either a flexible sigmoidoscopy and barium enema or a colonoscopy prior to September 1, 2004, those tests would have shown that [Dilley] had diverticulosis";

(5) "The failure of [Dilley's] health care providers to order a full colon evaluation during the 90-day period from June 1 until September 1, 2004, constituted a deviation from the standard of care";

(6) "On September 1, 2004, [Dilley] again complained of abdominal pain to Dr. Drincic who ordered [Dilley] receive a barium enema, but the VAMC failed to perform this test for unknown reasons that are not attributable to [Dilley]";

(7) "This mistake was a component of the more general breach of the standard of care in failing to assess [Dilley's] colon";

(8) "[Dilley] was seen in the VAMC primary care clinic on October 29, 2004 with complaints of 'dark red jelly' in his stool," and his complaints "should have resulted in an order for a colonoscopy";

(9) "The standard of care required that such colonoscopy occur 'within the month'";

(10) "A colonoscopy performed [within the month] would have shown diverticulosis";

(11) "Diverticulosis is a malady of the colon," and "[i]t is generally asymptomatic and is an incidental finding of various studies";

(12) "Authoritative medical literature indicates that between ten to twenty-five percent of patients with diverticulosis will develop diverticulitis";

(13) "Diverticulitis is inflammation of the colon that is symptomatic and can cause bowel obstructions";

(14) "Diverticulitis always involves some degree of perforation of the colon";

(15) "Physicians can treat most diverticulitis patients successfully with medical management, including antibiotics, rather than surgery"; and

(16) "In Mr. Dilley's case, he likely suffered a macroperforation of the colon within 12 hours of his presentation to the emergency room, i.e., the late afternoon of December 30, 2004."

Despite conceding VAMC employees breached the applicable standard of care in failing to diagnose Dilley with diverticulosis in a timely manner, the United States challenges Dilley's motion for partial summary judgment on the issue of liability. The United States contends there are material issues of fact remaining as to (1) "whether the standard of care requires specific education of a patient when that patient is diagnosed with diverticulosis," and (2) whether Dilley's pain actually began three days before Dilley sought treatment at the VAMC Emergency Room, or whether Dilley's pain began the night before Dilley went to the hospital for treatment or some other time. The court perceives the United States essentially disputes causation.

## II.   ANALYSIS
### A.   Standard of Review

Federal Rule of Civil Procedure 56(c) instructs that a motion for summary judgment should be granted if, after consideration of the evidence, the court concludes "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "[I]n ruling on a summary judgment motion, the Court views the facts in the light most favorable to the nonmoving party and allows that party the benefit of all reasonable inferences to be drawn from the evidence." Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997) (citation omitted).

The proponent of a motion for summary judgment bears the initial burden of notifying the trial court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party is responsible for supporting its motion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. In response to a properly supported motion, the opposing party must produce "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### B.   Legal Standard

This action arises under the Federal Tort Clams Act (FTCA), 28 U.S.C. §§ 2671-2680. Pursuant to 28 U.S.C. § 1346(b)(1), this court has jurisdiction to hear claims arising under the FTCA, and must determine liability "in accordance with the law of the place where the act or omission occurred." Because the conduct giving rise to Dilley's allegations took place in Nebraska, the issue of whether the United States is civilly liable to Dilley must be evaluated using Nebraska law.

Under Nebraska law, "[i]n a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was a proximate cause of the plaintiff's alleged injuries." Hamilton v. Bares, 678 N.W.2d 74, 79 (Neb. 2004) (citation omitted). "Ordinarily, in a medical malpractice case, the plaintiff must prove the physician's negligence by expert testimony." Fossett v. Board of Regents, 605 N.W.2d 465, 468 (Neb. 2000).

### C. Dilley's Motion for Partial Summary Judgment

In his motion for partial summary judgment, Dilley argues there is no genuine issue of material fact regarding the United States' liability because VAMC employees breached their standard of care by (1) failing to conduct a thorough evaluation of Dilley's colon and diagnose Dilley with diverticulosis, and (2) failing to educate Dilley about the diagnosis.

#### 1. Failure to Examine and Diagnose

In its Brief in Response to Dilley's Motion for Partial Summary Judgment, the United States concedes Dilley's allegation that VAMC health care providers breached their standard of care in failing adequately to examine and to diagnose timely Dilley's condition. This concession is supported by the testimony of the United States' expert witnesses.

The United States retained two physicians, Dr. David R. Dyke (Dr. Dyke) and Dr. Mark Mailliard (Dr. Mailliard), to serve as expert witnesses for the defense. Dr. Dyke and Dr. Mailliard are both gastroenterologists. Dr. Dyke retired from the practice of medicine in December 2008, and previously practiced in Lincoln, Nebraska, from 1974 until his retirement. Dr. Mailliard works as a gatroenterologist with the University of Nebraska and is currently employed as a contract physician with the Omaha VA Hospital. In 2004, Dr. Mailliard was employed by the VA and was likely involved in Dilley's treatment. In his deposition, Dr. Mailliard testified the VAMC health care providers probably breached their standard of care by failing to provide Dilley either a colonoscopy or barium enema within 90 days of Dilley's June 1, 2004, report of rectal bleeding. Dr. Mailliard further testified, if a proper evaluation had been completed within 90 days, Dilley would have been diagnosed with diverticulosis.

Dr. Dyke was also deposed about his expert opinion on Dilley's treatment, and testified it was probably a breach of the standard of care that someone at the VA did not ensure Dilley received the barium enema which was ordered on September 1, 2004. Dr.

Dyke further testified the VAMC employees probably breached their standard of care by failing to provide Dilley with a colonoscopy by December 1, 2004. Dr. Dyke indicated either one of these tests likely would have revealed Dilley had diverticulosis.

Because the United States and its expert witnesses concede VAMC employees breached their standard of care by failing properly to evaluate Dilley's condition and by failing to diagnose Dilley with diverticulosis at some time after June 1, 2004, when Dilley first reported rectal bleeding, and before December 31, 2004, when Dilley needed emergency surgery, summary judgment is granted on this issue.

### 2. Failure to Educate

Dilley asserts, if his VAMC health care providers had diagnosed him with diverticulosis, the standard of care would have required a reasonable physician to educate Dilley "that his diverticulosis could develop into diverticulitis," and "[Dilley] should have been warned that diverticulitis needs prompt treatment in order to avoid catastrophic consequences." Dilley contends, if the VAMC had educated him about his condition, Dilley would have known he needed to seek immediate medical treatment on December 28, 2004, when Dilley began to experience increased abdominal pain. Instead, Dilley maintains he did not seek treatment until December 31, 2004, because "his health care providers had led him to believe that his presentation was not serious and could wait until his colonoscopy scheduled for January 12, 2005." Dilley concludes, if he had "sought care in the first few days of his inflamed bowel, more likely than not," he would have been amenable to other treatments and "would not have needed the emergency surgery."

The United States argues summary judgment on the issue of liability is improper because there are material issues of fact as to whether the standard of care required VAMC employees to warn Dilley that diverticulosis could potentially develop into the more serious condition of diverticulitis.

Dr. Dyke testified in his deposition that when he conducts a colonoscopy on a patient and discovers diverticulosis, he informs the patient they have diverticulosis and generally advises the patient to increase the fiber in his or her diet. Dr. Dyke also usually provides the patient with a handout which discusses diverticulosis, and educates his patients that "a certain percentage of people might develop some inflammation, which we call diverticulitis, and if that happens, you need to let your family doctor know, . . . your interternist, or us, because we should put you on some antibiotics if that happens." Dr.

Dyke further notifies his patients that if the inflammation occurs, the patient will usually experience pain in the left lower quadrant of the abdomen, and the pain the patient will experience will not go away and is different from any pain the patient has previously experienced. Dr. Dyke also advises his patient to seek treatment if the pain persists for "several hours," and informs the patient of the serious risks involved, such as needing surgery, a colostomy, or hospitalization.

Dr. Dyke, after reading his deposition testimony, drafted a declaration clarifying that he "understood that [he] was being asked to explain what [he] personally would tell a patient with newly diagnosed diverticulosis," not "what other health care providers might routinely give, or should give, to a patient with newly diagnosed diverticulosis." Dr. Dyke then explained, "[I]t is my expert opinion that other health care providers should at least tell the patient newly diagnosed with diverticulosis that he or she has diverticulosis, and should recommend to that patient to increase fiber in the diet."

Similarly, Dr. Mailliard testified the standard of care does not require a physician to tell a patient who has been diagnosed with asymptomatic diverticulosis that the patient may develop diverticulitis. Dr. Mailliard stated he does generally inform his patients they have diverticulosis, "[b]ecause they ask," but Dr. Mailliard does not believe the standard of care requires further discussion. However, Dr. Mailliard did recognize further education may be necessary for those patients who experience symptoms, as compared to those patients who are asymptomatic. When discussing patients who manifest "mildly symptomatic diverticulosis," Dr. Mailliard noted, "we stress that severe abdominal pain, . . . anorexia, fever, change in bowel habits, usually . . . it's a constipation problem, are signals that you need to, of course, seek care." Dr. Mailliard continued, "But would I tell them that any abdominal pain you have to worry about diverticulitis, that's just not the case."

While the United States concedes VAMC employees breached the standard of care in failing to diagnose Dilley with diverticulosis, the United States and both of its expert physician witnesses contend this diagnosis would have been inconsequential to the outcome in Dilley's case because the standard of care does not require physicians to inform patients diagnosed with diverticulosis that the patient may develop diverticulitis. Because there are material issues of fact remaining regarding what education and warnings were required under the standard of care, summary judgment is improper on this issue.

-11-

### 3) Other Issues of Material Fact
#### a) Onset of Pain

The United States contends, "There is a genuine issue of material fact as to whether [Dilley's] pain started on December 28 or on the evening of December 30, 2004, or somewhere in between." The United States argues, "This fact is central to the issue of whether there was any alleged delay on [Dilley's] part in seeking treatment, and whether any such delay would have affected his need for [the] surgery he underwent on December 31, 2004."

To support its position that there is conflicting evidence as to when Dilley's pain began in the days preceding Dilley's presentation at the VAMC Emergency Room, the United States points to two separate progress notes which were drafted by VAMC health care professionals on December 31, 2004. The first report states, "The patient describes his pain as sharp and stabbing in nature, 10/10 in severity. . . . He states the pain began 3 days ago and has not improved." The second December 31 progress note reads, "[Dilley's] current pain started last night and he describes this to be different from his previous pain."

The United States interprets these progress notes to demonstrate that when Dilley was asked about his pain onset, he reported two different time frames—three days ago, and last night—creating a material issue of fact for a factfinder to determine. Dilley maintains the progress notes do not conflict with one another, but simply describe the increased severity of the pain he was experiencing. Dilley asserts he "began experiencing increased pain associated with an episode of acute diverticulitis on or about December 28, and that pain became markedly worse on the afternoon of December 30, when [Dilley's] colon perforated further and an abscess formed." Dr. Mailliard's interpretation of Dilley's medical records appears consistent with Dilley's description of the records. However, Dr. Zijun Hao, a third physician expert witness for the defense, subscribes to the interpretation adopted by the United States.

Although Dilley's and Dr. Mailliard's interpretations may make more sense, the issue of when Dilley began experiencing the diverticulitis pain before his presentation to the VAMC Emergency Room on December 31, 2004, is reasonably contested, and therefore, summary judgment on the issue of overall liability is improper.

### b) Possibility of Treatment Without Surgery

Perhaps the most significant issue of material fact precluding summary judgment on the issue of liability is Dilley's contested assertion that, if he had gone to the VAMC Emergency Room sooner, his condition could have been successfully treated with antibiotics, and without the need for emergency surgery. The government disputes this issue, noting the expert physician witnesses who were deposed in this case provided conflicting responses when asked about the likelihood Dilley would have been amenable to treatment with antibiotics alone, and when Dilley would have needed treatment in order for antibiotics to be effective. Thus, the issue of whether Dilley would have needed emergency surgery, even if he had been properly educated and sought treatment at an earlier time, is another material issue of fact precluding summary judgment on the issue of liability.

### III.   CONCLUSION

Dilley's motion for partial summary judgment as to the liability of the United States is granted in part, and denied in part.

IT IS ORDERED:

1. Plaintiff Kenneth D. Dilley's Motion for Partial Summary Judgment *(Filing No. 51)* is granted in part. There are no genuine issues of material fact that VAMC employees breached the standard of care due Dilley by failing to evaluate and to diagnose Dilley's condition (diverticulosis) on more than one occasion after June 1, 2004, and before December 31, 2004. Summary judgment is granted on this limited issue.

2. The motion is denied in all other respects.

3. A separate judgment will be entered.

DATED this 22nd day of July, 2009.

                                BY THE COURT:

                                /s/ William Jay Riley
                                United States Circuit Judge
                                Sitting by Designation